**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**DOCKET NO. 21-60248-cr-DIMITROULEAS**

**UNITED STATES OF AMERICA,**

    **Plaintiff,**

**vs.**

**STEWART BITMAN,**

    **Defendant,**
**-----------------------------------------/**

**DEFENDANT STEWART BITMAN'S RESPONSE TO THE PRESENTENCE INVESTIGATION REPORT**

The defendant, Stewart Bitman, by and through his undersigned counsel, and pursuant to U.S.S.G. § 6A1.2-3, p.s., Fed. R. Crim. P. 32 (d), (e)(2) and (f), and the Fifth Amendment to the United States Constitution, respectfully registers his Response to the Presentence Investigation Report (PSR) and Request for a Below-Guideline Sentence of 10 Years or 120 Months. While highlighting several facts and clarifying others, this submission will not attempt to replicate the comprehensive and well-prepared PSR that is already before the Court and hereby adds as follows:

**I. INTRODUCTION:**

On February 18, 2022, Stewart Bitman pled guilty to Counts One through Four of an Indictment charging him with enticement of a minor, in violation of 18 USC § 2422(b). Stewart Bitman knows these are serious charges. Indeed, the terms of the written Plea Agreement he signed

as well as the PSR prepared in this case, confirm these are serious charges; a mandatory minimum sentence of 120 months on each count with a term of supervised release up to LIFE, and a total offense level 43 and an *advisory* guideline sentence of LIFE.[1] Stewart Bitman has been incarcerated continuously since July 23, 2021.

Stewart Bitman is a 65 year old New York native who came to South Florida in 1990 after completing his medical education and training. He has since worked as a gastroenterologist and is a founding partner of the medical practice Gastro Health in Coral Springs. He has been married for almost 40 years and he is a father of adult children and he has two grandchildren. He has lived in the same home in Parkland for the past 20 years. Stewart Bitman has absolutely no prior criminal history.

Any sentence imposed for a violation of 18 USC § 2422(b) on a 65-year-old man with a history of serious health problems is, effectively, a Life sentence. Stewart Bitman can expect to receive statutory good time, 18 USC § 3624(b), reducing the time he will serve on any prison sentence imposed by this Court, by approximately 15%. However, the instant offense bars him from receiving the benefit of an early release to a halfway house under 18 USC § 3624(c)(1). He will also be barred from a minimally secured BOP camp and communicating with his wife and family via the BOP's Corrlinks email system. If Stewart Bitman survives the prison sentence requested via this memorandum, 120 months or 10 years, he will be well into his seventies. Any sentence imposed in this case will require sex offender registration and

---

[1] The United States Sentencing Commission's "Sourcebook" FYE 2020 provides sentencing information for the 64,565 federal cases sentenced that year. According to Table 24 of the publication, 99.3% of all cases sentenced that year fell below total offense level 43.

2

notification and allow for a term of supervised release of Life under the jurisdiction of this Court. (See Plea Agreement) where he is able to live and work, and who he associates with, will all be dictated by his convicted sex offender status. Notwithstanding all the above, Stewart Bitman has accepted responsibility for his involvement in the offense, and he is profoundly remorseful.  With that said, we believe a Below-Guideline sentence of 120 months or 10 years, for this 65-year-old first-time offender is *reasonable*, and this filing will present sentencing factors under 18 USC § 3553 in support of that sentence.

## II.  SENTENCING MEMORANDUM:

The following is submitted pursuant to the sentencing factors of 18 USC § 3553 in support of a Below-Guideline sentence of 120 months or 10 years.  As a result of the Supreme Court decision in *United States v. Booker*, 125 S.Ct. 738 (2005), the Sentencing Guidelines are now "effectively advisory" in all cases. Id, at 757.  The result is that a District Court must now "consider guideline ranges", but may "tailor the sentencing in light of other statutory concerns as well." Id. at 757.  Thus under *Booker*, sentencing courts must treat the Guidelines as just one of a number of sentencing factors set forth in 18 U.S.C. §3553(a).  The basic mandate and overriding principle of §3553(a) requires a District Court to impose a sentence "sufficient, but not greater than necessary, "to comply with the four purposes of sentencing set forth in §3553(a)(2):

      (a)    to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

      (b)    to afford adequate deterrence to criminal conduct;

> > (c)   to protect the public from further crimes of the defendant; and,
>
> > (d)   to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

In determining what sentence is sufficient, "but not greater than necessary" to comply with § 3553(a)(2) purposes of sentencing, the sentencing court is further directed to consider the following factors:

> > (1)   "The nature and circumstances of the offense and the history and characteristics of the defendant";
>
> > (2)   "The kinds of sentences available";
>
> > (3)   "The Guidelines and policy statements issued by the Sentencing Commission, including the (now non-mandatory) guideline range;
>
> > (4)   "The need to avoid unwarranted sentencing disparity among defendants who have been found guilty of similar conduct", and
>
> > (5)   "The need to provide restitution where applicable.  18 U.S.C. § 3553(a)(1), (a)(3)-(7)."

Neither the statute itself nor *Booker* suggests that any one of these factors is to be given greater weight than any other factor.  However, what is clear is that all of these factors are subservient to § 3553(a)'s mandate to impose a sentence not greater than necessary to comply with the four purposes of sentencing.  A sentencing court is further guided by 18 U.S.C. § 3582, which provides that in determining whether and to what

extent imprisonment is appropriate based on the § 3553(a) factors, the judge is required to "recognize that **imprisonment is not an appropriate means of promoting correction and rehabilitation**" (emphasis added).

**Nature and Circumstances of the Offense:** Stewart Bitman has signed both a written Plea Agreement and Factual Proffer in this case. The facts of this case are also presented in the Offense Conduct section of the PSR.

Stewart Bitman has accepted responsibility for his involvement in this offense. His remorse is profound; his apologies extend to the victims of this offense, as well as his wife of 40 years, his children, and the medical community. However, with that said, long before the Federal Sentencing Guidelines were ruled *advisory*, *U.S. v. Booker*, 543 U.S. 220 (2005), § 5K2.0 allowed sentencing courts to depart downward if the court found there existed a mitigating circumstance of a kind, or to a degree, not adequately considered by the Sentencing Commission in formulating the guidelines. This section of the Guidelines was subsequently amended to include § 5K2.0(b), in accordance with 18 USC § 3553(b)(2)(A)(ii), however, the intent and the application has not changed.

The nature and circumstances of this case are different. We believe much different than cases in which guidelines under Part G - Offenses Involving Commercial Sex Acts, Sexual Exploitation of Minors, and Obscenity have been applied. In fact, we believe the nature and circumstances of this offense are much different than the pornography and production cases our courts have seen over the years. This case involved the use of Snapchat, an application developed by Evan Spiegel and Bobby Murphy, two Stanford University students who felt

5

emoticons were not sufficient to transmit the emotion someone might wish could be sent with a text message. The following comes from The Dark Side of Snapchat and Teens, by Wayne Parker, updated June 13, 2020, for VeryWell Family.[2]

**Overview:** The idea of Snapchat is that users can send time-limited photos that might be embarrassing or just silly without a significant fear it will find its way to other social media sites where it might live forever.

**How Snapchat Works:** Once the Snapchat application is downloaded from the App Store or from Google Play, the user registers and sets a password. It then accesses your contacts on your cell phone to load friends to the application, or you can add other friends beyond your contact list.

Once you load the App and log in, you can take a photo, edit it, add a caption, or other "doodles." Then you select the friends to send the photo to and set a timer from one to 10 seconds. After the photo is sent, the receiver has the time set by the timer after they access the app to look at the photo before the message "self-destructs."

Friends can then take their own photos to reply or just send a message back.

**Popularity:** Snapchat is wildly popular, with 41% of teens ages 13 to 17 using the app, according to 2015 research by the Pew Group. Consider these stats, compiled by Omnicore.

• In 2020, Snapchat had an average of 218 million daily active users that generated over three billion snaps a day.

• Active Snapchatters open the app 30 times a day.

---

[2] www.verywellfamily.com/what-is-snapchat-and-its-use-1270338

• More than 60% of active Snapchatters create a new content on a daily basis.

• On average, users spend 49.5 minutes a day on Snapchat and send 34.1 messages a day.

**Parental Concerns**: Despite its popularity, parents are right to be concerned about Snapchat - there are a host of issues that can compromise kids' safety.

First of all, for parents who monitor their children's smartphone use, Snapchat doesn't save pictures and messages sent so you can see them later. If you have a software package that allows you to see the content of your child's phone remotely online, you won't be able to see what was sent and then automatically deleted. That may raise some concerns.

Finally, because of the lower risks of having a photo eventually making the rounds of the Internet, it's also tempting for teens to use Snapchat for "sexting." Snapchat itself admits that up to 25% of users may send sensitive content on a regular basis "experimentally."

The Offense Conduct section of the PSR describes Stewart Bitman's communication with four teenage victims using the Snapchat app. In no way does he suggest this is not a serious offense, or that young victims were not harmed by his conduct. However, we submit that when § 5K2.0 of the Guidelines was originally written in October 1987, the Sentencing Commission never envisioned Snapchat.

Why is this all significant? Because this Court is aware that in almost all production/pornography cases, defendants carefully upload, collect and trade the pornographic images they have either produced or have received from others. Indeed, much has been written about the re-victimization of the young children behind the pornographic images.

United States Attorney Michael Moore, speaking after the sentencing of Christopher Oates, made the following statement. "Child victims are subject to being victimized again and again every time someone views or downloads a photo or video depicting child pornography. The diligence and good work by Homeland Security helped us get one more criminal away from his computer."[3]

"Child pornography destroys the lives of its victims," said Attorney General Lisa Madigan,. "These children are victimized again and again every time these horrid images are viewed, downloaded and traded on the internet."[4]

"The children are just continuously victimized every time the video or picture is transmitted," said Supervisory Special Agent John Deaton, U.S. Immigration and Customs Enforcement. "They're victimized again and again. It's a never-ending victimization."[5]

With all that said, we believe even the Government will concede Stewart Bitman received all of the images his victims sent him via Snapchat. He did not collect the images, he did not download the images, and he never shared the images. He could not do it. He knew it and his victims knew it. And for that reason, this Court is asked to consider what is referenced as The Basic Approach, that has appeared in Chapter 1, Part A, of every Sentencing Manual, since  October 1987. 'To understand the guidelines and their underlying rationale, it is important to focus on the three objectives that Congress sought to achieve in enacting the

---

[3] United States Attorney's Office, Middle District of Georgia, press release dated November 26, 2014.
[4] Illinois Attorney General, press release dated September 30, 2010.
[5] Investigators: Children Pictured in Pornographic Images are Continuously Victimized, by Kyle Feldscher, dated February 6, 2012.

Sentencing Reform Act of 1984." Those three objectives are to insure **honesty, uniformity and proportionality** "in sentencing through a system that imposes appropriately different sentences for criminal conduct of differing severity." Stewart Bitman, a 65-year-old man with severe health problems, asks this Court to consider imposing a Below-Guideline sentence of 120 months or 10 year sentence in his case.

**History and Characteristics of Defendant:**

  **1. Personal and Family History**: Stewart Bitman is a 65 year old New York native with absolutely no prior criminal involvement. He is the son of Melvin and Lilian Bitman, the older brother of Allen Bitman and Marlene Fox, the husband of Leonor Bitman for almost 40 years, the father of Rachel, Michelle and Daniel, and the grandfather of two.

  Stewart Bitman was raised by both parents in the Bronx. His father was a clothing manufacturer and his mother worked in the computer field. His maternal grandparents also lived in the family and so he and his siblings were well cared for during those years. He described a happy childhood; however, he described several weeks when he was sexually abused by his female third grade teacher. He has often thought of it but never shared the details with his family.

  Stewart Bitman completed high school and earned an undergraduate degree at Bronx High School of Science (NYU). In 1977, he left the family home for the first time and attended the University of Monterrey, Mexico Medical School. There, he met his future wife, Leonor; he was in his second semester of medical school, and she was studying clinical psychology at

the same university.  He earned a medical degree in 1982, he married his wife a few months later, and he completed an internship at New York Medical College in Valhalla, New York. Between 1983 and 1990, he completed two years general surgery, two years internal medicine and two years gastroenterology.

Stewart Bitman and his wife moved to South Florida in 1990.  By then, they were a family of five.  The family home has been in Parkland for the past 20 years.  His wife, his oldest child and her husband and two children currently live there.  He had been a founding partner in Gastro Health in Coral Springs since 1992 and worked as a gastroenterologist and hepatologist. His arrest in this case resulted in his termination of employment and additional business and investment interests that have already cost him millions.  He has been in continuous federal custody since July 23, 2021.

**2. Stewart Bitman is 65 Years Old and has a History of Serious Health Problems:** Mr. Bitman believes this Court may consider that, at 65 years of age   and already facing many health problems, he presents a much lower risk of recidivism than most offenders.  In *United States v. Lucania,* 379 F. Supp. 2d 288, 297 (E.D. N.Y. 2005), the district judge found that "Post-*Booker* courts have noted that recidivism is markedly lower for older defendants" and in *United States v. Nellum,* 2005 WL 300073 (N.D. Ind. Feb. 3, 2005)(unpub.), the court cited lower recidivism rates for older defendants and granted a downward departure.  In this case, Mr. Bitman asks this Court to impose a Below-Guideline sentence of 120 months or ten years.

The "Silver Tsunami" by Evan A. Jenness and published in the September/October 2013 Champion, discusses the issue of elderly and infirmed inmates.  What is "old" when it comes

to sentencing a defendant to prison is not the equivalent of "old" in the outside world. The medium age of a federal defendant at sentencing is 34.[6] The National Institute of Corrections defines prisoners 50 and older as "elderly" and "aging",[7] and 15 states specifically define an "older" inmate as 50 or older.[8] Only 10.8 % of all federal defendants are over 50.[9]

Stewart Bitman has a history of serious and complex medical conditions. Most significant is skin cancer and a rare carcinoid pancreatic cancerous tumor. For the past 20 years, he has been treated for Actinic Keratosis, a skin condition that has flared up since his incarceration because he has no received treatment. For the past 15 years, he has been treated for squamous cell skin cancer. Over the years there have been multiple skin resections on his face, back, and knees. He has not received continued treatment for this since his incarceration. He is at high risk for recurrence of the cancer or metastatic cancer.

Since 2014, he has been treated for carcinoid tumor of the pancreas. He underwent pancreatic resection and had his spleen and gallbladder removed. The pancreatic tumor has a high risk of recurrence or to metastasize. Follow up treatment is required to include abdominal MRIs every six months and specific blood, including platelet counts. This blood work must be done following dietary exclusions which has not occurred since his incarceration. The removal or partial removal of these organs leaves him at risk for immune issues, including Covid and pneumonia.

---

[6] Sourcebook, Table 6
[7] Dr. Joann B. Morton, An Administrative Review of the Older Inmate, USDOJ, National Institute of Corrections, 4 (1992)
[8] Old Behind Bars, at 17
[9] Sourcebook, Table 6

Stewart Bitman had a partial pancreas resection, and his gall bladder and spleen were removed. This makes him immune-compromised and places him at high risk of serious flu, pneumonia, or Covid infections. His condition requires a fresh food diet, but he has only been offered processed foods during his incarceration.

He was on a strict medical observation/treatment plan before his incarceration. His doctors recommended MRIs with/without contrast every six months to monitor for cancer recurrence. He is also to have specific blood tests evert six months (Chromogranin A levels to identify carcinoid tumors, pancreatic polypeptides, 5 hiaa 24 urine collection with urine stored chilled). Some of these tests require proper dietary exclusions before testing. He also requires routine blood work to monitor platelet levels. Unfortunately, he has not received these treatments since his incarceration.

Stewart Bitman also has the potential for serious cardiac issues and his cardiac care had not been performed since his incarceration. In 2014, he was diagnosed with a lung mass too deep to biopsy. Routine imaging was done regularly to monitor the size of the mass; however, not since his incarceration. None of his medical needs have been taken seriously and he has nor received proper care since his incarceration. Before his arrest he was prescribed one medication (Lotrel) for hypertension, and he was doing well. He has not received this drug since his incarceration and, instead, he has received four or five different hypertension medications at the same time, and they are ineffective.

For the past 20 years, he has been treated for hyperlipidemia, which has accelerated arthroscopic disease with an elevated calcium heart score of 4500.He has a history of angina

and tachycardia.

Since 2019, he has suffered from lumbar pain, the result of multi-level degenerative disc disease. There are times he is bedridden because of the pain. He requires annual MRIs and monitoring.

In 2019, Stewart Bitman had his right cataract surgically repaired. His left cataract is now in need of surgical repair and he is experiencing visual impairment at this time.

Stewart Bitman reported episodic depression, anxiety and what he feels is PTSD since his sexual abuse as a child. He never discussed the abuse or sought treatment until his arrest in the instant offense. Beginning in January 2021, he had telemedicine appointments with psychiatrist, Dr. Daniel Bober, who prescribed Zoloft and Trazedone for depression and sleep. He also began counseling with David Ockman in Pompano Beach. This treatment lasted until his arrest. He has lost 40 pounds since his incarceration.

The following is from a letter written by Dr. Geórge Rodriguez, cardiologist, dated April 29, 2022.

> He has coronary artery disease in the form of coronary artery calcifications with strongly abnormal calcium score with last nuclear cardiac imaging stress performed in 2019 failing to demonstrate any evidence of any significant ischemic burden with very good functional capacity. The patient has been treated with statin therapy and baby aspirin empirically. The patient has no previous history of cardiac event such as TIA, stroke, or myocardial infarction but also has family history of cardiovascular disease.
>
> The patient should continue to be evaluated periodically

13

> with cardiac evaluations including echocardiogram, carotid Doppler examination as well as cardiac imaging stress test to assure that his cardiovascular status has not progressed or deteriorated even in the absence of significant symtomatology.

The following is from a letter written by Dr. Rohan Faria, oncology and hematology, dated May 2, 2022, with supporting documentation from a July 2, 2021 follow-up appointment..

> • Stewart Bitman underwent a distal pancreatectomy, spienectomy and cholecystectomy on February 14, 2014 at Jackson Memorial Hospital.
>
> • "Dr. Bitman is a 65-year-old male with a history of nonfunctional pancreatic neuroendocrine tumor, post-spienectomy syndrome and a lung nodule."
>
> • "He is in clinical remission based on this reevaluation and will continue on an observational approach."

The following is from a letter written by Dr. Randy Burks, ophthalmologist, dated May 3, 2022.

> Dr. Bitman carries the following ophthalmic diagnoses:
> • Cataract left eye.
> • Blepharitis (severe) both eyes.
> • Posterior vitreous detachments both eyes (stable).
> • Dry eyes and Meibomian gland dysfunction.
> • Conjunctival chalasis both eyes.
> • Choroidal nevus right eye.
> • Early ectropion left eye.
> • Cataract surgery completed on the right eye February 2019.
> I have treated Dr. Bitman for these conditions and he is stable as

>of his last visit on July 1, 2021.  I performed cataract surgery on his right eye in February of 2019 with excellent results.  He will need periodic follow-up of the above chronic conditions.  The only item that may require intervention in the near future is the cataract on his left eye.  He is currently on lubricating eye drops, lid hygiene, and wears glasses for distance and near acuity.

Pursuant to amendment 739 to § 5H1.4, a defendant's physical condition, individually or in combination with other offender characteristics, such as age and the length of any expected sentence, may be considered as sentencing factors in fashioning a *reasonable but not greater than necessary sentence.*

In an August 21, 2006 memorandum to all district court judges, the Administrative Office of the U.S. Courts indicated that the Bureau of Prisons will consider the presentence investigation report, the statement of reasons and judicial placement recommendations in assigning a CARE level to an inmate.  There are four levels in the BOP CARE level system, which classifies inmates according to their healthcare needs.  At 65 years of age and with Mr. Bitman's current health problems, we believe he is already precluded from Level 1.  Level 2 is reserved for inmates who are stable out-patients, who can handle their own daily living activities, and their need for acute medical services is less than three months in duration, occur no more than every two years, and can ne resolved without hospitalization.  Level 3 is reserved for inmates who are fragile out-patients and Level 4 is for inmates with acute medical conditions. At Stewart Bitman's current age and health, any incarceration will, most likely, result in his immediate designation to the higher CARE levels.  His advancing age and increasing health conditions will certainly tax the resources and finances of the Bureau of

Prisons, place an added risk to the inmate, and exacerbate present conditions. Certainly, the medical evidence in this case is that every day Mr. Bitman is incarcerated will be far more challenging to him and the BOP compared to the vast majority of the inmate population. Even when the sentencing guidelines were mandatory, downward departures under § 5H1.4 were permissible. Again, Stewart Bitman is asking this Court to impose a Below-Guideline sentence of 120 months or 10 years.

**3. Bureau of Prisons Designation and Visiting Issues Unique to Stewart Bitman:** The Bureau of Prisons encourages visiting by family, friends, and community groups to maintain the morale of the inmate and to develop closer relationships between the inmate and family members or others in the community" (see BOP p.s. 5267.07). However, we believe the BOP might consider designating Stewart Bitman to a higher CARE level, very possibly one of only a few federal medical centers that exist for male inmates. These centers are currently located at Butner, North Carolina, Devens, Massachusetts, Lexington, Kentucky and Rochester, Minnesota.

Stewart Bitman's offense of conviction must also be considered by the BOP's Designation Center. Notwithstanding his health concerns, the offense of conviction will make Stewart Bitman eligible for the BOP's Sex Offense Management Program (SOMP), which is 18 months in duration. SOMP facilities are currently at FCI Elkton in Lisbon, Ohio, FCI Marianna, Florida, FCI Seagoville, Texas, FCI Petersburg, Virginia, FCI Elkton, Maryland, FCI Englewood, Colorado, USP Marion, Illinois, USP Tucson, Arizona, and FMC at Devens, Massachusetts. Wherever Stewart Bitman is designated, unlike RDAP and 18 USC § 3621(e),

SOMP does not provide early release benefits upon completion of the program. Further, the offense of conviction will also most likely bar him from the use of a computer while he is confined and, therefore, he will not be able to communicate with his wife or anyone else through the Corrlinks email system.

**4. Life Sentence:** Stewart Bitman's crime is serious. "Punishment is required. Even if this Court imposes a sentence which will eventually allow for his release, his conviction will result in the stain of a federal felony conviction for a sex-related crime. Extensive restrictions affecting where he can live and work, and how he will be controlled, will follow him for many years." *United States v. D.M.*, 2013 U.S. Dist. LEXIS 63560, at *3 (E.D.N.Y. May 3, 2013).

As already stated, any sentence imposed in this case will be a LIFE sentence. Even if he survives a prison sentence in this case, pursuant to 18 USC § 3583(k), following release, he may serve a term of supervised release for the remainder of his life, under the supervision of the United States Probation Office and usually under the close watch of a sex offender specialist. He will be required to register as a sex offender under state and local laws, and he will have to follow laws which will make it difficult for him to choose where to live, where to work, and who he may associate with. Again, any sentence imposed in this case will be a LIFE sentence.

### III.  REQUEST FOR VARIANCE

Per the factors highlighted above and all other relevant factors under 18 U.S.C. § 3553(a), Stewart Bitman requests this Honorable Court consider a variance and depart from the

recommended sentencing range. Attached the Court will find a detailed Confidential Psychological Evaluation, dated May 12, 2022, completed by Dr. Lori Butts, J.D. and Ph.D. (Exhibit A)  It is most important that Dr. Butts opined that Mr. Bitman's sexual risk assessment score is low and he is of low risk to re-offend.

### IV.  LETTERS ABOUT STEWART BITMAN

Attached to this memorandum are letters from people who know Stewart Bitman . (Composite Exhibit B) These testimonials further confirm that his life has been overwhelmingly honorable, caring and productive once he overcame his significant early life trauma.   Also Attached (Composite Exhibit C) are letters of active treatment and diagnosis from his treating physicians.

### V.  REQUEST TO PRESENT ORAL TESTIMONEY AT SENTENCING

Stewart Bitman requests this Court allow him to present oral testimony at Sentencing. Potential witnesses are immediate family members that will be traveling to the Southern District of Florida to appear before this Honorable Court on June 24th, 2022.

### VI.  REQUEST FOR FORMAL DESIGNATIONS

Stewart Bitman requests this Honorable court enter a designation to the Bureau of Prisons based on all the factors highlighted, to the Federal Medical Center at Devens.  Stewart Bitman also requests this Honorable Court recommend him to participate in a Residential Drug Abuse Program (RDAP)

## CONCLUSION

Based upon the facts and factors set forth above, Stewart Bitman respectfully requests this Court: 1) impose a Below-Guideline sentence of 120 months or 10 years and; (2) recommend the BOP designate him to an appropriate facility as highlighted above.

Stewart Bitman and Counsel thank this Court for considering our Response to the PSR Request For a Below-Guideline Sentence of 120 months or 10 years, and the many letters written to this Court on his behalf. Counsel will have further remarks at the time of sentencing.

Respectfully Submitted,

The Law Offices of Joshua D. Rydell
Attorney for Defendant
633 Southeast 3rd Avenue Suite 203
Fort Lauderdale, Florida 33301
Phone  (954) 779-1711
Fax     (954) 779-1714
Email  jr@jrydell.com

By:/s/ Joshua D. Rydell
Joshua D. Rydell
Florida Bar No: 28372

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true and correct copy of the foregoing has been filed with the Clerk using CM/ECF and furnished to all parties of record registered with the CM/ECF system on this 15th day of June, 2022.

Respectfully Submitted,

The Law Offices of Joshua D. Rydell
Attorney for Defendant
633 SE 3rd Ave Suite 203
Fort Lauderdale, Florida 33301
Phone   (954) 779-1711
Fax     (954) 779-1714
Email   jr@jrydell.com

By:/s/ Joshua D. Rydell
Joshua D. Rydell
Florida Bar No: 28372